# THE STATE OF CALIFORNIA.

## SIMPSON et al. v. THE STATE OF CALIFORNIA.

## THE BARKENTINE PORTLAND.

## PACIFIC COAST S. S. CO. v. THE BARKENTINE PORTLAND.

*(District Court, N. D. California. November 27, 1889.)*

1. COLLISION—BETWEEN STEAM AND SAIL—EVIDENCE.
   A steamer and barkentine collided on a clear night, either because of the failure of the steamer to see the barkentine's red light, or because of the absence of such light. The testimony as to whether such red light was burning brightly at the time was irreconcilably conflicting. It appears that the mate of the barkentine had taken down the red light to clean and trim it. He testified that this was done more than an hour before the collision, but he had previously stated that it was done within half an hour of the collision. There were three men on watch on the steamer, none of whom saw the red light until a minute before the collision. The steamer's lights were plainly visible from the barkentine. *Held*, that the preponderance of the evidence showed that the collision was caused by the barkentine's failure to keep her red light brightly burning.

2. SAME—EMERGENCY.
   The fact that the steamer, after discovering the barkentine's red light, kept on her course in the attempt to cross the bow of the barkentine, which attempt very nearly succeeded, does not show negligence, since in such an emergency the captain of the steamer might use his judgment as to the best means of avoiding a collision.

3. SAME—DUTY OF STEAMER.
   A steamer is not obliged to moderate her speed on sighting a vessel sailing on the starboard tack in the night, when such vessel's red light is not visible, since in such case the steamer may infer that the vessel's course is parallel to its own.

In Admiralty.
*Edward W. McGraw*, for A. M. Simpson *et al.*
*McAllister & Bergin*, for the State of California.

HOFFMAN, J. On the morning of April 7, 1886, a little after 4 o'clock A. M., a collision occurred between the steam-ship State of California and the barkentine Portland, a short distance from the entrance to this port. The night was dark but clear. The Point Bonita, Point Reyes, and Fort Point lights were plainly visible. Each vessel was perfectly apprised of her position. They were bound in. The steamer was pursuing her direct and usual course towards the entrance of the harbor. The barkentine had, some hours before the accident, tacked, and was standing off on a course to the westward of north, probably waiting for daylight before entering the harbor. The wind was N. E., or perhaps a little to the northward of that point. Her course was about N. by W. She was, therefore, close-hauled on her starboard tack. The course of the steamer was a little to the northward of E. by N. The vessels were thus approaching each other on courses which were not far from at right angles to one another. The steamer was struck by the barkentine on the starboard side abaft the beam, while endeavoring to cross the bows of the latter. It is obvious that, if the lights required by law had been displayed by the vessels, and if they had been navigated with ordinary skill and care, no collision could have taken place. One or both

of the vessels must, therefore, have been in fault. The proofs are very voluminous. I have examined and considered them with the more care, as the United States local inspectors and the supervising inspector appear to have differed in opinion as to the vessel to which responsibility for the accident should attach. I think the solution of this question will depend upon the answer to be given to a single inquiry: Did the barkentine display her red light in such a condition as to brightness, and at such a time before the collision, as would have enabled the steamer with proper diligence to have avoided the accident? As to the steamer's lights, there is no dispute. These were of more than ordinary size and brilliancy. Her white head-light was seen and recognized by the barkentine at least 15 minutes before the collision, and when she was several miles distant. A few minutes afterwards her green light was observed, and subsequently, and just before the collision, her red and even her saloon lights became visible. The witnesses on the part of the barkentine unanimously declare that the lights on board of her were burning brightly, but of these three men were below up to the moment of the collision. They were roused by the shouting of the men on deck, when the steamer was close upon them. If the barkentine's lights were properly constructed and set, and burning brightly, the steamer must have been guilty of gross and inexcusable negligence in failing to see the red light, and to alter her course accordingly. If, on the other hand, the barkentine's red light did not become visible until too late to avoid the collision, the steamer is blameless. The night was sufficiently clear to permit the harbor lights to be distinctly seen, and even the steamer's head-light, at a distance of three or four miles. If the barkentine's red light was not seen by the steamer in time to avoid the collision, it must have been because it was not set, or was dim, or else because the steamer failed to exercise proper diligence. The testimony being irreconcilably conflicting we are driven to attempt to arrive at the truth by an estimate of probabilities. It is the well-known, and, I believe, invariable, practice of the commanders of the large passenger steamers on this coast to station themselves on the bridges of these vessels when entering the harbor, and to remain there until extraordinary diligence becomes unnecessary. Capt. Dedney, the master of the State of California, a skillful and experienced officer, was accordingly on the bridge from the time Point Bonita light was made until the moment of collision. The second mate, the officer of the deck, was with him, and a lookout was duly stationed forward. That they were vigilant may be inferred from the fact that a sail on the starboard bow was discovered and reported; but no light could be detected. Capt. Dedney therefore concluded that the vessel was bound in on a course not far from parallel to his own. He therefore kept on his course. It was not, he says, until a minute before the collision, and when too late to avoid it, that he saw a dim red light, which apprised him that the vessels were steering on converging courses. On board of the barkentine, the only persons on deck were the mate, Peterson, and three men,— two of them Russian Fins, and a third named Mullane. It may seem a a little singular and inconsistent with the habitual heedlessness of sea-

men before the mast that they were all careful to observe, and are now able to testify that the lights were burning brightly. But if, as they say, they directed their attention to their own lights after the steamer's headlight was observed, their doing so was perhaps not unnatural. But it is more singular that all those who were below and rushed on deck at the very moment of the collision, and when the vessel had been so injured that she would have sunk had she not been lumber-laden, also directed their attention to the lights, and are prepared to swear positively that they were burning brightly.

There are some points in the mate's deposition which deserve attention. He states that he observed that the red light was burning dimly. He therefore took it down, and into the cabin and pantry, where he trimmed the wick, wiped off the glass, and replaced the light. It is remarkable that no one of the crew observed this important incident, or, if they did, they have not mentioned it. Peterson testifies that it occurred more than an hour before the collision. But he seems to have made a statement or declaration, which was reduced to writing at Hull, England, to the effect that the collision occurred "at 3:35 by our clock," and that he took the light down "after three o'clock." He adds, in the same statement, that he took down the light after the steamer's green light appeared. In his deposition taken in this suit he testifies that his declaration at Hull was incorrect, or incorrectly taken down, and that in fact he trimmed and replaced the light long before the steamer's lights were discovered. Which of these statements is true it is impossible to determine with certainty. If it be true that he took the light down after the steamer's green light became visible, and he was occupied in trimming, wiping it off, and resetting it some eight or ten minutes, as seems not unlikely, the failure of the steamer to observe it during the brief but critical interval in which she could have altered her course or stopped and backed is explained. The omission of the other witnesses to make any mention of the fact is significant, if not suspicious.

One other circumstance, though of no great importance, deserves mention, as it seems to indicate carelessness or laxity of discipline on the part of the barkentine. From the moment the steamer's head-light was discovered it must have been apparent to the mate of the barkentine that the steamer was bound in, and that the two vessels were on converging courses which might bring them together; and yet the master of the barkentine was suffered to sleep undisturbed in his cabin, and was only aroused by the shouting of the men when the collision was imminent and inevitable. The lights of the barkentine are stated to have been the customary regulation lights; but neither they nor similar ones are produced in court to establish beyond controversy their sufficiency.

The foregoing is, I believe, a correct summary of the testimony bearing on the controverted point on which the decision of the cause must turn. Its solution depends, as before observed, upon an estimate of probabilities. Which is the more likely? That the red light was taken down by Peterson to be trimmed after the green light of the steamer came in view, as he is said to have stated in his declaration at Hull, or

that for some other reason the light was burning dimly; or, on the other hand, that it was burning brightly, and that the master and mate of the steamer, and especially the former, after being apprised of the proximity of a sailing vessel, were so negligent as to fail to discern the plainly visible red light of an approaching vessel, which it was the principal business of the master, when he took his station on the bridge, to look out for and detect at the earliest moment? It may be that the captain and mate were so impressed with the idea that the course of the vessel, whose sail they had discovered, was parallel to their own, that they paid no further attention to her. But they were accurately apprised of their position. The harbor lights were all visible, and there was nothing to divert their attention from the only object from which danger could be apprehended. If, on this occasion, the master failed to closely watch for the lights of the barkentine, he was guilty of gross, and, I must think, unpardonable, negligence. After mature consideration, I have reached the conclusion that the steamer failed to see the red light of the barkentine because it was either not displayed or was burning dimly.

One or two minor points remain to be noticed. It was suggested that the steamer should have moderated her speed when the sail of the barkentine was described. But the red light of the latter was not then visible, and the steamer was justified in supposing that the vessels were sailing on nearly parallel courses and were not approaching each other. It is only in the latter case that the regulations required her to moderate her speed. It is further claimed that when the steamer did discover the red light of the barkentine she should have stopped and backed, or altered her course so as to avert the collision. But the red light was not visible until, as Capt. Dedney swears, about a minute before the accident. If I am right in supposing that the red light was not previously visible through the fault of the barkentine, the captain of the steamer was by that fault placed *in extremis*, and is not responsible if he failed to adopt measures which might possibly have prevented the accident. His judgment at the time was that his only hope of avoiding the collision lay in holding his course and endeavoring to cross the bows of the barkentine. In this he very nearly succeeded. The barkentine struck him abaft his beam. Had the steamer gone less than half her length further, the vessels would have gone clear of each other. It is impossible to affirm that any other course would have been more judicious or have afforded greater chances of escape. At all events he exercised his best judgment in an emergency not due to his own fault, and this is all that the law requires.